Kershaw Manufacturing Company, Inc. v. Commissioner.
Kershaw Mfg. Co. v. Commissioner
Docket No. 82015.
United States Tax Court
T.C. Memo 1961-98; 1961 Tax Ct. Memo LEXIS 253; 20 T.C.M. (CCH) 443; T.C.M. (RIA) 61098; March 31, 1961
*253 Fred S. Ball, Jr., Esq., First National Bank Bldg., Montgomery, Ala., and H. C. Kilpatrick, Esq., for the petitioner. Wallace M. Wright, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: The respondent determined deficiencies in petitioner's income tax for the taxable years ended April 30, 1955, and April 30, 1956, in the amounts of $39,380.48 and $133,384.83, respectively. The issues for decision are: 1. Whether the amounts accrued on the books of the petitioner as bonuses are deductible in the years as accrued. 2. Whether bonuses were paid to petitioner's employees in cash or in petitioner's 5 percent noncumulative preferred stock; and 3. If the bonuses are held to have been paid in stock, what is the fair market value of the petitioner's 5 percent noncumulative preferred stock on the date on which it was delivered to petitioner's employees. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation organized under the laws of the State of Alabama with its principal place of business in Montgomery, Alabama. It is engaged in the business of manufacturing machines *254 which are used by railroad companies in maintaining their railroad tracks and roadbeds. Petitioner keeps its books and records and files its income tax returns on an accrual method of accounting. It filed its income tax returns for its taxable years ended April 30, 1955, and April 30, 1956, with the district director of internal revenue at Birmingham, Alabama. Issue 1. At a meeting of petitioner's board of directors on April 29, 1953, a bonus was authorized for petitioner's taxable year ended April 30, 1953. The minutes of this meeting state in this respect: A bonus of $25,000.00 was authorized to be paid to the employees as follows: Royce Kershaw
$8,500.00
Jeff W. Davis
4,500.00
H. H. (Red) Williams
3,000.00
W. R. Skinner
2,500.00
J. W. Owens
2,500.00
E. F. Turner (salesman)
1,000.00
Dave Hallberg (salesman)
500.00
Mabel Coney
1,000.00
Millard Moore
300.00
Aubrey Knight, Jr.
300.00
Thomas W. Burley
300.00
Elson Horne
300.00
Miriam Mathers
200.00
Rita Dalby
200.00
The president and secretary of the corporation are authorized to issue $25,000.00 of preferred stock to the said employees in exchange for the bonus paid to them. The *255 fiscal year 1953 was the first year in which petitioner had paid any bonus to its employees. At or about the time that checks were issued for the amount of bonus accrued for the year 1953, petitioner's president told the employees that the company had experienced a very good year and had decided to give the employees a bonus because they had helped build the company and make the profits, and that the company was going to continue giving the employees a bonus as long as it made a profit. Thereafter as new employees came into the company they were told that they could not be told exactly what bonus they would receive but that the company had a policy of paying about 25 to 35 percent of its profits to all employees and particularly to the keymen employed by it. At meetings of the employees held at various times during the years and at company parties the employees would be told of the company's policy of giving a bonus if it had a good year. In about March of 1954 petitioner's president, Royce Kershaw, and its executive vice president, Jeff W. Davis, began making up lists of the employees on the payroll who had been in the company as long as 6 months. They would note the amount of bonus *256 each employee had received in the preceding year and would put down some figure opposite each employee's name as a tentative bonus for the current year. In April of 1954 Kershaw and Davis set down opposite the employee's name the final amount that they had determined as the employee's bonus for that year. On May 1, 1954, the checks and stock certificates were issued for the bonuses as finally determined by Kershaw and Davis for the year 1954. Petitioner, for the year 1954, accrued on its books the amount of $27,316.99 representing checks issued on May 1, 1954, in the amount of $22,400 which resulted in the acquisition of preferred stock by petitioner's employees of a par value of that same amount and withholding taxes paid of $4,916.99. Each employee who received a bonus for the fiscal year 1954 was not informed as to the amount thereof until May 1, 1954, when the stock certificates were delivered. Petitioner had no rule of thumb for determining the amount of bonus to be paid and the amount finally determined depended on a number of considerations, including the amount of money that petitioner had in the bank. For the taxable year ended April 30, 1955, petitioner's president followed *257 the same procedure of consulting with Davis and making a tentative determination with respect to the bonus to be received by each employee and subsequently determining the final amount of each employee's bonus. The total amount of the bonus to be paid to petitioner's employees was determined after the books were closed for the taxable year and a balance sheet made out. The list of the employees and the bonuses determined for them by Kershaw and Davis for the fiscal year 1955 was furnished to petitioner's bookkeeper, Thomas M. Derickson, Jr., sometime around the end of July or early in August in order that the checks could be made up, the stock could be prepared, and the amount of income tax and social security tax deductions determined to be entered on the stub of the checks which were prepared. This bookkeeping work would take several days for completion. Derickson did not know the total amount of the bonuses determined or the amount allowed to each employee prior to being furnished the list made up by Kershaw and Davis for the purpose of preparing checks and making tax computations. Neither Derickson nor the other employees of petitioner knew of any formula by which the bonus might *258 have been ascertained. Each individual employee other than Derickson had no knowledge of the amount of bonus he was to receive, if any, until he received the stub of the check made out to him or the stock was issued to him. Kershaw and Davis in determining the amount of bonus to be paid to any particular employee took into consideration how long the employee had been with the petitioner, his salary, the quality of his work during the past year, his loyalty to the company and his willingness to work. Employees who had been in petitioner's employ for 6 months or more were eligible to receive a bonus. The checks drawn for the amount of the 1955 bonus were dated August 10, 1955, and November 30, 1955, and the stock certificates were all dated August 19, 1955. For the taxable year ended April 30, 1955, petitioner accrued on its books and deducted on its income tax return as bonuses paid to its employees the amount of $75,731.70, which deduction was disallowed by respondent. For the taxable year ended April 30, 1956, petitioner accrued and deducted on its income tax return the amount of $129,971.02 as bonuses. The amount so deducted by petitioner was decreased by $76,877.32 in respondent's *259 notice of deficiency with the following explanation: (a) Bonus compensation to employees during the taxable year ended April 30, 1956 has been decreased in the amount of $76,877.32, computed as follows: 1. Bonuses accrued during taxable
year ended April 30, 1956
$129,971.02
2. Bonus compensation allowable
and adjustment to bonus ac-
count: (a) Stock bonus
$31,262.00
(b) Withholding taxes
paid on accrued
bonuses
13,104.64
(c) Cash bonuses
6,050.00
(d) Adjusting entry
2,677.06
53,093.70
Net decrease in bonus compensation
$ 76,877.32
The amount of $53,093.70 represented the amount of bonus for petitioner's fiscal year 1955 determined by respondent to be properly deductible in its fiscal year 1956. In determining this amount respondent valued the stock of a par value of $100 per share issued to employees on August 19, 1955, at $58 per share, thus reducing the total amount of bonus claimed to have been paid by petitioner by the difference between $53,900 and $31,262. The withholding taxes paid during the taxable year ended April 30, 1956, with respect to the bonus which had been accrued for the fiscal year 1955 was $13,104.64. For petitioner's *260 taxable year ended April 30, 1956, approximately the same procedure was followed with respect to the determination of the amount of bonus to be paid to each employee and the notification of the employees as to their bonuses as was used in the fiscal year 1955. Each employee did not know the amount of the bonus to be received by him for the fiscal year 1956 until he received the check stub and was delivered the stock for his first bonus payment for that year. For the fiscal year 1956 checks in the face amount of $52,100 dated July 3, 1956, were drawn and stock certificates in the same amount dated July 3, 1956, were delivered to the employees; checks in the face amount of $46,500 dated October 24, 1956, were drawn and stock certificates dated October 25, 1956, in this same par value amount were delivered to the employees, making a total par value of stock delivered to employees during petitioner's taxable year ended April 30, 1957, in the amount of $98,600. During petitioner's taxable year ended April 30, 1957, the amount of $26,893.65 was paid to the district director of internal revenue as withholding taxes based upon the total amount of bonuses accrued by petitioner for its taxable *261 year ended April 30, 1956. The schedule prepared by Kershaw and Davis of the bonuses to be allowed each employee for his work for the taxable year ended April 30, 1956, was delivered to Derickson, petitioner's bookkeeper, sometime after the close of the taxable year ended April 30, 1956, but prior to the date the checks and stock certificates were issued. In the notice of deficiency respondent allowed for the petitioner's taxable year ended April 30, 1957, bonuses in the total amount of $88,559.02, computed as follows: Stock bonus determined herein
$57,188.00
Withholding taxes paid for employees
26,893.65
Cash bonus to employees
4,175.00
Adjusting entry
302.37
$88,559.02 Respondent disallowed the bonuses which had been accrued on petitioner's books and deducted on its income tax return for the taxable year ended April 30, 1957, in the amount of $28,290.22. The amount of $28,290.22 accrued by petitioner for its taxable year ended April 30, 1957, was composed of nonnegotiable notes payable in five equal annual installments beginning May 1, 1958, with interest of 5 percent from May 1, 1957, with the privilege to petitioner of prepaying all or any unpaid part *262 of each note at any time. These notes were dated December 26, 1957, and were delivered to the employees on approximately that date. Withholding taxes were computed by petitioner and paid by it to the district director as each installment on these notes was paid. Respondent and petitioner agree that petitioner is entitled to a deduction in the face amount of the notes in either the taxable year ended April 30, 1957, or 1958. Issue 2 When petitioner was ready to deliver bonuses to its employees for the taxable years ended April 30, 1955, and April 30, 1956, groups of employees were called into one of petitioner's offices. They were told to come in to sign for their stock and no mention was made of checks. Derickson represented petitioner in the payment of the bonuses to the employees. When each employee came into the office there was placed before him, upside down, the check made out to him in the net amount of the bonus which had been listed for him. The employee was instructed to sign for his stock, whereupon he signed his name on the back of the check. The check stub was then detached and given to the employee showing the breakdown for social security and withholding taxes and *263 net bonus figure while the check itself was handed back to petitioner's representative. The employee was then handed his shares of stock. The employee also received at that time a form letter announcing the stock bonus. On August 19, 1955, when employees received their bonuses for the fiscal year 1955 the form letter given to them bore as a part of the form, the date August 12, 1955. One such letter, received by employee Henry Huie, read as follows: TO: Employees of More Than Six Months Service: Henry Huie It is with a great deal of pleasure to announce the company had a very profitable and successful year. Many factors enter into the success of the company during the past year and one of the most important is the efficient work, the loyalty, and the dependability of all employees. Following out our policy of giving employees a stock bonus of approximately thirty per cent of our earnings, we are happy to advise you that your stock bonus is 5 shares of preferred stock of the company, payable 2 shares now and the balance of 3 shares before the end of the year. Prospects are exceptionally bright for the coming year and no doubt it will be necessary for us to expand our manufacturing *264 facilities and our organization to take care of this increased business. I sincerely hope that we can make further promotions from our present employees during the next year. Your loyalty, devotion to your job, and your efficient work is appreciated. Sincerely, /s/ Royce Kershaw Royce Kershaw President. At the time the employees received their first bonus for the fiscal year 1956 on July 3, 1956, they were handed an undated letter stating the amount of the respective bonuses. One such letter, received by employee Henry Huie, is as follows: TO ALL EMPLOYEES WITH MORE THAN 6 MONTHS SERVICE. For Henry Huie I am very happy to announce a bonus to you of 10 shares of Preferred Stock of this company. I am enclosing 5 shares with this letter and will deliver the balance of 5 shares around October 1st. The annual dividend rate on this stock is $5.00 per share payable $2.50 Semi-Annually. According to our Stock Record you now own 15 shares of Preferred Stock with annual dividends of $75.00. Dividend check for $12.50 is enclosed for the last Semi-Annual dividend. This bonus has been made possible through the fine spirit of loyalty and devotion to the job of all employees. To *265 pay a bonus, the company must make a profit and to make a profit we must all get our individual jobs done on time. With this continued team work, loyalty and the reputation of doing good work on time, the company will prosper and another liberal bonus can be expected next year. Thanks again and with my very best wishes, Sincerely /s/ Royce Kershaw President It was generally understood by all the employees that they were not to keep the checks that were handed to them, but were to endorse the checks on the back and receive stock instead. The retention of the check by any employee would have jeopardized his right to a future bonus. One employee who attempted to keep the check endorsed by him was prohibited from doing so. Generally, petitioner's employees would have preferred a cash bonus in the amount of the checks to a stock bonus. Issue 3 Petitioner builds machines used in the maintenance and reconditioning of railroad tracks and roadbeds. There are 18 different machines built by petitioner which range in price from $485 to $112,000. These machines for the most part are laborsaving devices. There was one instance where one of petitioner's machines performed the work *266 of 30 men. There is a continuing demand in the railroad industry for this type of laborsaving machinery. The petitioner holds eight or nine patents covering some of the machines which it makes. Petitioner was organized in 1946. Its gross sales for the first few years hovered around $30,000. By 1952 gross sales had reached about $80,000, in 1953 about $300,000, and in 1954 about $400,000. For the year ended April 30, 1955, gross sales were $932,965.91; for the year ended April 30, 1956, they were $1,980,234.74; and for the year ended April 30, 1957, they were $2,091,317.92. Petitioner's taxable income as shown on its income tax returns for the taxable years ended April 30, 1955, 1956, and 1957, were as follows: $105,975.59, $213,894.65, and $132,481.34, respectively. Petitioner, since its inception, has grown not only in terms of sales and profits but has also grown in relation to its competitors. Petitioner was originally ranked twentieth in its industry and is currently ranked fourth. The original capitalization of petitioner in 1946 was $32,500, which was represented by $20,000 of $100 par preferred stock which was paid in at par in cash and $12,500 $100of par common stock. *267 The following schedule shows the number of shares of petitioner's stock outstanding on the dates indicated: April 30,
April 30,
April 30,
April 30,
1954
1955
1956
1957
Preferred Stock
456
680
1,234
2,220
Common Stock
125
125
125
125
The following schedule shows total assets, total liabilities, net worth, and earned surplus of petitioner on the dates indicated: April 30,
April 30,
April 30,
April 30,
1954
1955
1956
1957
Total Assets
$375,988.88
$630,128.42
$1,056,752.20
$967,476.38
Total Liabilities
214,243.63
415,869.00
690,605.28
466,129.95
Net Worth
$161,745.25
$214,259.42
$ 366,146.92
$501,346.43
Earned Surplus
$ 76,858.20
$129,372.37
$ 231,310.87
$277,983.38
During the calendar year 1955, 539 shares of preferred stock were delivered to petitioner's employees. The amount of earned surplus per each share of preferred stock outstanding after the 1955 distribution, based on the amount of earned surplus of April 30, 1955, was $104.84 and based on the amount of earned surplus of April 30, 1956, was $187.44. During the calendar year 1956, 986 additional shares were issued to petitioner's *268 employees. The amount of earned surplus per each share of preferred stock outstanding after the 1956 distribution, based on the amount of earned surplus of April 30, 1956, was $104.19 and based on the amount of earned surplus of April 30, 1957, was $125.21. The amount of net income for the taxable years ended April 30, 1955, and April 30, 1956, after payment of Federal income taxes as reported per each share of preferred stock outstanding on April 30, 1956, was $45.97 and $87.81, respectively. The amount of net worth per share of preferred stock following the 1955 stock distribution, computed by dividing the corporate net worth of April 30, 1955, by the total number of shares of preferred stock outstanding on April 30, 1956, was $173.63. The amount of net worth per share determined by dividing the net worth of April 30, 1956, by the number of preferred shares outstanding on April 30, 1956, was $296.71. The net worth per share of the outstanding preferred stock based on the corporate net worth of April 30, 1956, divided by the number of outstanding preferred shares on April 30, 1957, was $164.93. The net worth per share of preferred stock determined by dividing the net worth of *269 April 30, 1957, by the number of preferred shares outstanding on that date was $225.83. The stock in issue is stated on the certificate to be a preferred stock. It has a $100 par value, paying a 5 percent or $5 dividend per year, is noncumulative as to dividends, and is nonvoting. No dividends were paid on preferred stock for a 5-year period ending about 1953. Until 1953 the preferred stock had been owned, directly or indirectly by holders of the common stock. Following 1953, dividends of $5 per share have been regularly paid with the exception of one semiannual payment in 1957 of $2.50. These dividends are paid to all holders of the preferred stock irrespective of the fact that the holder's employment with petitioner might have terminated in the interim. American Ice Co., American Snuff Co., W. R. Grace & Co., Helme (George W.) & Co., and United States Tobacco Company are corporations for which financial data is available in Standard and Poor's Industrial Manual. Each of these companies had outstanding in 1955 and 1956 noncumulative preferred stock with some voting rights and some preference in liquidation with the following par values and dividend rates. Dividend
Rates
Per-
Par
Company
cent
Value
American Ice Co.
6
$100
American Snuff Co.
6
100
W. R. Grace & Co.
8
100
Helme (George W.) & Co.
7
25
United States Tobacco Company
7
25
*270 The following tabulations show the assets and income coverages for these five companies and for petitioner on the bases and for the periods indicated: (a) Current assets per $100 of liabilities plus preferred stock at par. 1954
1955
American Ice Co.
101.00
106.00
American Snuff Co.
243.20
276.00
W. R. Grace & Co.
106.00
107.00
Helme (George W.) & Co.
308.00
319.00
United States Tobacco Company
202.00
213.00
Petitioner
69.00
89.00
(b) Total assets per $100 of liabilities plus preferred stock at par. 1954
1955
American Ice Co.
290
280
American Snuff Co.
278
319
W. R. Grace & Co.
211
206
Helme (George W.) & Co.
343
355
United States Tobacco Company
264
277
Petitioner
130
131
(c) Interest on long-term debt plus net income after taxes divided by interest on long-term debt plus preferred dividend requirements. 1950-
1951-
1954
1955
Aver-
Aver-
1954
1955
age
age
American Ice Co.
5.3
6.0
3.3
4.2
American Snuff Co.
7.8
8.7
6.8
7.2
W. R. Grace & Co.
4.8
5.1
6.6
5.7
Helme (George W.)
& Co.
5.4
5.8
5.6
5.5
United States
Tobacco Co.
6.4
7.3
12.8
10.7
Petitioner
10.3
12.9
10.5
12.1
*271 On the basis of market quotations, the yields on the preferred stock of each of the five companies were as follows: Aug. 19,
July 3,
Oct. 25,
1955
1956
1956
Percent
Percent
Percent
American Ice Co.
5.80
5.93
6.14
American Snuff Co.
4.60
4.72
4.92
W. R. Grace & Co.
5.88
5.91
6.00
Helme (George W.) &
Co.
4.65
4.67
5.05
United States Tobacco
Co.
4.79
4.73
4.98
From August 19, 1955, to April 30, 1957, petitioner's employees sold 402 shares of petitioner's preferred stock, all of which was purchased by petitioner, by Royce Kershaw, petitioner's president, Knox Kershaw, the son of petitioner's president, or Royce Kershaw Company, Inc., a corporation controlled by the same interests as petitioner. The following schedule shows the dates, amount of stock sold by employees, the amounts paid to those employees per share, and the total consideration paid to the employees for their preferred stock for the above-mentioned period with the average prices per share for the periods indicated: Taxable Year Ended April 30, 1956
Number
Amount
Total
Date
of Shares
Per Share
Consideration
August 19, 1955
6
$100.00
$ 600.00
September 12, 1955
3
100.00
300.00
March 3, 1956
43
70.65
3,038.05
April 9, 1956
23
65.78
1,512.95
Average price
Total
75
per share $ 72.68
Total $ 5,451.00
Taxable Year Ended April 30, 1957
July 1, 1956
1
$ 65.00
$ 65.00
July 6, 1956
17
100.00
1,700.00
July 31, 1956
3
100.00
300.00
July 31, 1956
22
65.00
1,430.00
August 2, 1956
4
80.00
320.00
August 8, 1956
14
65.00
910.00
August 29, 1956
23
50.00
1,150.00
November 5, 1956
16
50.00
800.00
November 21, 1956
9
40.00
360.00
November 22, 1956
2
50.00
100.00
November 27, 1956
6
50.00
300.00
December 31, 1956
3
40.00
120.00
January 4, 1957
25
50.00
1,250.00
January 9, 1957
5
50.00
250.00
January 10, 1957
9
50.00
450.00
January 11, 1957
3
50.00
150.00
January 14, 1957
3
50.00
150.00
January 15, 1957
11
50.00
550.00
February 4, 1957
7
50.00
350.00
February 12, 1957
2
40.00
80.00
February 23, 1957
2
50.00
100.00
February 23, 1957
38
40.00
1,520.00
April 2, 1957
9
50.00
450.00
April 3, 1957
3
50.00
150.00
April 11, 1957
5
50.00
250.00
April 30, 1957
59
50.00
2,950.00
April 30, 1957
26
59.62
1,550.00
Average price
Total
327
per share $ 54.30
Total $17,755.00
Average price
Grand Total
402
per share $ 57.73
$23,206.00
*272 Douglas Jackson, a certified public accountant who was employed by petitioner, received five shares of petitioner's preferred stock in 1955 for services rendered and he reported this receipt on his income tax return as income by valuing the stock at $100 per share. Petitioner's noncumulative preferred stock had a value of $70 per share on August 19, 1955. Opinion Issue 1 Petitioner contends that it is entitled to deduct in each of the taxable years ended April 30, 1955, April 30, 1956, and April 30, 1957, the bonuses accrued by it in those years which were actually paid 2 months or more following the close of the taxable years. In the alternative petitioner contends that the amount accrued by it as bonuses in its taxable year ended April 30, 1954, and paid in its fiscal year 1955 should be deducted in the year in which paid. There has been no deficiency determined by respondent for the taxable year ended April 30, 1957, but for a proper computation to be made of the amount of the net operating loss sustained in the taxable year ended April 30, 1958, which may be carried back to the taxable year ended April 30, 1956, it is necessary to determine whether the amount of $28,290.22, *273 accrued in the taxable year ended April 30, 1957, is deductible in that year as claimed by petitioner or in the taxable year ended April 30, 1958. The parties are agreed as to the amount of this bonus but differ as to the year in which it is deductible. The other issues raised in the pleadings as to the net operating loss carryback have been disposed of by agreement between the parties. Petitioner argues that once it had set up the bonus plan it was definitely obligated to its employees to pay a bonus of somewhere between 25 and 35 percent of its net profits in each year and was entitled to accrue in the year for which the bonuses were given the amount actually paid as bonuses during the following year. Respondent contends that the bonus plan was so lacking in specificity as to the amount of the bonuses to be paid, the recipients thereof, and the time of payment that no obligation was incurred by petitiner during the taxable year to pay a bonus to its employees so as to permit an accrual in advance of actual payment. It has long been held that an item of expense is to be accrued in the *274 year during which all the events have occurred fixing the amount thereof and the taxpayer's liability for the item though not paid. ; . The rule is also that the amount of the liability will be deemed fixed if at the end of the taxable year the amount is ascertainable by a fixed standard even though the amount has not been ascertained because the final computation has not been made. ; (C.A. 2, 1932), certiorari denied ; and . However, where the item, whether of income or deduction, depends upon a contingency or future event, it may not be accrued until the contingency or event has occurred and fixed with reasonable certainty the fact and amount of the liability involved. . In the present case petitioner by a vote of its board of directors gave a bonus in 1953. At the time that bonus was paid to the *275 specified employees, Kershaw announced to all the employees that the petitioner had adopted a policy of paying an annual bonus to the employees of between 25 and 35 percent of its net profits. In the years subsequent bonuses were in fact paid to the employees. The workers understood that such a bonus policy was in effect; however, for any particular year the workers were not certain or assured of the amount of the bonus, if any, that each individual would receive or the total amount actually to be paid. These two factors were not even tentatively determined until some time approximately a month before the end of the taxable year when Kershaw in conjunction with Davis, would make a preliminary designation of the amount of each employee's respective share and the total amount to be paid in bonuses. It is not absolutely clear when the tentative determination would be made final for any year except the taxable year ended April 30, 1954. Even if so-called final determinations were made before the close of the fiscal years 1955, 1956, and 1957, the so-called final determinations were subject to revision when the books for the year had been posted and audited. It was not until the individual *276 employee was called into the office to receive his bonus that he knew for certain how much, if any, he was to receive as a bonus. There is nothing in the bonus plan, as set up, requiring that the amount set opposite each employee's name be paid to him. Also Kershaw's testimony indicates that only after the aggregate amount of petitioner's profit for the applicable year had been computed, which would be after the end of the fiscal year, could the total amount of the bonus be actually determined. It is clear that there was no fixed formula for determining the bonuses but as Kershaw testified "It just depended on how much money we had in the bank, and a lot of things we used." The record does not support petitiner's contention that it was obligated to pay a specific minimum amount of the profits to its employees. The record shows that the amount ultimately determined upon as a bonus was paid in stock and not in cash, and as we hereinafter hold this bonus was a stock bonus paid in stock of a value considerably less than its par value. The value that the stock would have at some undetermined future date when it would be delivered to the employees could not be reasonably ascertained *277 at the close of petitioner's taxable year for which the bonus was given. Kershaw appears to have had the sole discretion to determine when the stock would be issued and delivered to the employees. The notes given for the bonuses for the fiscal year 1957 were in an amount considerably less than 25 percent of the profits as reported on petitioner's income tax return for that year before deduction of the amount of the bonus accrued on its books. Where the amount of the bonus can vary within the discretion of petitioner's president, the liability is not sufficiently fixed during the taxable year to permit an accrual. Until a definite amount had been paid over to the employees in the year following the year of accrual, the petitioner had no obligation to pay a bonus in a specified amount which was ascertainable with sufficient certainty to be properly accrued. Cf. ; ; and . In support of its position petitioner cites . However, in Avco, the amount of the extra *278 compensation or bonus was determined by a fixed formula in effect during the year of accrual which in accordance with formal action by the directors of that corporation could not be changed after the close of the taxable year of accrual. It is the presence of this formula which was not subject to change after the close of the year that makes the amount of the bonus determinable so as to permit an accrual. Where the amount is determinable by a formula or is otherwise specified, it may be accrued. , affd. (C.A. 7, 1953); ; and , affd. (C.A. 6, 1959). The facts herein are more comparable to those in , affirmed per curiam (C.A. 6, 1950), than to the facts in the Avco Manufacturing Corporation case. In the Federal Machine & Welder Co. case we held bonuses not to accrue until the year in which paid where under the plan as adopted by the taxpayer there were no fixed amounts ascertainable *279 to be due and payable to any of the officers and employees and there was no definite liability to pay the extra compensation to any of the participants. See also (C.A. 6, 1931), affirming a Memorandum Opinion of this Court, and (C.A. 6, 1953), reversing ; and . The cases cited by petitioner in support of its contention that it had incurred a legal obligation to pay the employees a bonus of between 25 and 35 percent of its net profits are distinguishable on their facts. In (Ct. Ch., N.J., 1922), the employee, an oyster ship captain, was to work "on shares." It was shown that in the trade "on shares" had a specific meaning as to the amount to which the employee was entitled. In fact, the employer-defendant did not argue otherwise but contended only that the "on shares" provision was not meant to apply to the years in issue. In (Ct. Civ. App., Tex., 1945) the employer *280 definitely obligated himself to pay an employee a bonus of between 3 and 5 percent of the net profits as well as a stated salary. In that case the minimum amount of 3 percent would be received by the employee in any event pursuant to the specific agreement between the employer and employee and could not be lessened. In the present case it is clear that petitioner had no specific agreement with any specific employee to pay any bonus to that employee. The record in the instant case shows that a large portion of the bonuses paid in the fiscal year 1953 was to Kershaw. There is no evidence that this same situation did not or could not have prevailed in other years. Therefore, the rights, if any, of the other employees would depend entirely on the portion of the bonus Kershaw chose to assign to himself. In , the plaintiff's decedent was to receive a "fair and equitable share of the net profits" arising from the defendant's use of certain patents developed by the decedent. The Supreme Judicial Court of Massachusetts granted a recovery to the plaintiff based on the vague terms of the contract. However, it may be *281 observed that in this case the defendant under the terms of the contract, obligated itself to pay the decedent the same amount that the decedent could have recovered in any event, in quasi contract for reasonable value for the use of the patents. The present case is not comparable for there is no showing that petitioner's employees were not fully and fairly compensated by their regular wages and salaries for the services they performed for petitioner. In the case of (C.A. 4, 1926), the court found that the evidence showed that the plaintiff had been paid an amount as a bonus and at the time of each payment told that he would be paid approximately an equal amount as a bonus upon the completion of the 12 vessels then under construction. The court pointed out that the promise was not a vague and indefinite promise to pay a bonus but a promise to pay a specific amount. When the illusory nature of petitioner's bonus plan is considered, it appears that, in reality, the workers themselves were offered at most some share of the profits. *282 As a general rule bonus offers of such indefiniteness when complementing a regular salary or wage, are unenforceable. ; ; ; . Some courts in this situation will grant a quasi contractual recovery where the amount of the stated salary or wage does not fairly and adequately compensate the employee. . However, in the present case, as we have said, there is no showing that the employees were not fully and adequately compensated by their regular salaries or wages. Petitioner contends in the alternative that if the bonuses accrued and deducted in the taxable year ended April 30, 1955, are, in fact, deductible only for the taxable year 1956, it is entitled to a deduction for the taxable year ended April 30, 1955, of $27,316.99, composed of checks in the amount of $22,400 which were exchanged for preferred stock, and $4,916.99 withholding *283 taxes, paid to the Government, which was accrued by petitioner in its taxable year 1954 but paid to petitioner's employees during its taxable year ended April 30, 1955. Respondent argues that this alternative contention by petitioner was not made in any of the pleadings and therefore should not be considered by this Court. While the petitioner does not precisely mention the amount of the deduction alternatively claimed for its fiscal year 1955, it does allege error on the part of respondent in failing to allow a deduction in any amount for bonuses in the fiscal year 1955. This allegation is sufficiently broad to cover petitioner's alternative contention. The facts with respect to the bonus payment for petitioner's taxable year ended April 30, 1954, are very different from those present in later years. In the fiscal year 1954 the checks which were issued to employees which resulted in their acquisition of preferred stock were dated May 1, 1954. The stock was issued and delivered to employees on May 1, 1954. Petitione's bookkeeper testified that it took some time prior to the issuance of the checks and stock for preparation thereof and for computing the withholding and social security *284 taxes to be shown on the check stubs. It would follow that for the fiscal year 1954, the amount of the bonuses had been made definite before the close of the fiscal year on April 30 and the information given to the bookkeeper in order that he might prepare the checks and stock. This amount would probably have been set up as a liability on petitioner's books before the close of its fiscal year. At least, petitioner, on whom rests the burden of proof has not shown to the contrary. We agree with respondent that no amount was properly accrued by petitioner for bonuses in its fiscal year 1955, that bonuses in the amounts hereinafter determined to have been actually paid during the fiscal year 1956 for the year 1955 are deductible in the fiscal year 1956 and that the $28,290.22 paid in the fiscal year 1958 is deductible in that year and not in the fiscal year 1957. Issue 2. The next issue is whether the bonus paid to petitioner's employees in the taxable year ended April 30, 1956, was paid to them by checks drawn in favor of the individual employees or by petitioner's 5 percent, noncumulative preferred stock. Petitioner, in support of its proposition that the bonuses were paid by the *285 checks issued to the employees, contends that, although the checks were issued with the expectation that they would be exchanged for shares of stock, such was not necessarily the case because the workers were free to, and in some instances did, cash their checks and convert the proceeds to their own use. Respondent argues that the whole procedure whereby the checks were delivered to the employees for their endorsement and thereupon exchanged for petitioner's stock was nothing more than a two-step procedure which accomplished no more than if the stock itself had been initially issued to the employees. The inference we draw from the facts as set out in our Findings of Fact, is that petitioner's bonus plan was a stock bonus and not a cash bonus. The form letters that accompanied the receipt of the bonuses in both 1956 and 1957 designated each employee's share of the bonus in terms of a number of shares of stock; no mention was made of a cash amount. When the workers were called into the office to receive their bonuses they were told that they were coming in to "sign" for their stock. No mention was made of receiving checks or cash. When the workers did receive the checks they were *286 handed to them upside down for their signature. The workers generally understood that they were to endorse the checks and receive the stock instead. In support of its position petitioner relies on the testimony of Kershaw. However, even Kershaw never stated that he knew of any instance when an employee kept the check made out to him. He stated that he thought perhaps some of the employees kept the checks. There was no evidence introduced showing a specific instance of any employee ever taking one of the checks and cashing it. Petitioner argues that since respondent in the notice of deficiency allowed as a deduction certain amounts for bonuses paid in cash some of the checks must have been retained by the employees. There is no evidence tending to show any connection between the cash bonus allowed in the deficiency notice and the cashing of any checks delivered to the employees under the circumstances we have described. It is altogether possible that besides a stock bonus petitioner also paid out certain amounts in cash. Even if we were to assume that some of the employees did cash the checks which were delivered under the circumstances we have described, the fact still remains *287 that there was considerable coercion in that the right to future bonuses would be in jeopardy, militating against the employees' cashing their checks. Those employees who because of this coercion turned their checks over for stock never had outright possession of the checks or received payments of the amounts stated thereon. Cf. , (1944). The prior employees of petitioner who testified in this proceeding as respondent's witnesses stated that they would have preferred to have a cash bonus to stock. One of these witnesses testified that he saw an employee attempt to take the check when it was passed over to him to be endorsed but that he was not permitted to keep it. Petitioner produced no witness who testified that he believed he would have been permitted to keep the check. Issue 3. In view of our holding that petitioner's bonus was in fact a stock bonus, it is necessary to determine the value of the stock on August 19, 1955, the date it was issued to the employees during petitioner's fiscal year 1956. The parties have argued in their respective briefs that a determination should also be made as to the value of the stock on July 5, 1956, and *288 October 25, 1956, in order that the proper deduction for the taxable year ended April 30, 1957, could be ascertained. Respondent did not determine a deficiency for the petitioner's taxable year ended April 30, 1957, and we are therefore without jurisdiction over that year. It was necessary to determine the question of whether the bonus claimed by petitioner as accrued in its fiscal year 1957 was properly deductible in that year or in its fiscal year 1958 in order that the net operating loss carryback to the fiscal year 1956 could be properly determined. The question of the value of petitioner's stock on July 3, 1956, and October 25, 1956, has no relevancy to petitioner's tax liability for any year except its taxable year ended April 30, 1957, over which we lack jurisdiction. Respondent determined a value of $58 per share for petitioner's preferred stock. This was the average sales price (rounded off to the next higher dollar) over the period August 19, 1955 through April 30, 1957, of 402 shares of stock which had previously been issued to employees. These sales were made by various employees of petitioner to either petitioner, Royce Kershaw, petitioner's president, Knox Kershaw, *289 the son of petitioner's president, or Royce Kershaw Company, Inc., a corporation controlled by the same interests. It is respondent's contention that the quantity of sales here present, the equal of 26 percent of the amount of stock issued by petitioner during the calendar years 1955 and 1956, over this 21-month period is sufficient evidence to show the value of the stock issued during this period. He argues that this average sales price is the best evidence of the value of the stock as of August 19, 1955, and should be used in lieu of any other method of valuation. Petitioner argues that the wide fluctuations of the purchase prices without any explanation therefor clearly show that these prices should not be used as an indicator of market value. Petitioner argues that the value of the stock is its par value of $100 per share. In support of its contention petitioner points to the fact that the employees paid over to petitioner checks in the amount of $100 each for each share of preferred stock received and that petitioner withheld taxes for its employees on the basis that each share delivered to the employees was worth $100. For a minimum value of its stock petitioner relies on the *290 testimony of its expert witness. This witness compared petitioner's preferred stock with the preferred stock of five companies named in our Findings of Fact whose preferred stock was widely held and actively traded on the market. From a number of computations and comparisons based upon the data of these various companies which we have set forth in some detail in our Findings, this witness concluded that the value of petitioner's preferred stock on August 19, 1955, was $73.92 per share. He arrived at this value by first making a statistical computation based upon the comparison of petitioner's assets and earnings coverages with those of the five companies to arrive at a tentative value. From these comparisons he concluded that petitioner's preferred stock should yield 5.75 percent on August 19, 1955, and have a value per share of $86.96. He then reduced this tentative value by 15 percent to compensate for the lack of ready marketability of petitioner's stock as compared with the five publicly traded stocks. The discount of 15 percent was based upon statistics of the Securities and Exchange Commission covering the cost of flotation and distribution of new stock issues. In the alternative, *291 petitioner contends that if the actual sales are to be considered in determining value, then only those sales made at or about the date the stock was distributed to the employees should be considered. In our consideration of the valuation of the preferred stock we have given some weight to petitioner's expert testimony and also to the actual amounts paid to petitioner's employees for the exchange of their stock, which method was used by respondent in determining his valuation. However, we are mindful of shortcomings in both methods of valuation and feel that neither one nor a combination of both can be used as an exclusive indicator of value. One of the shortcomings in the testimony of petitioner's expert witness was that in determining some of the ratios employed by the witness the book value of the assets for each of the five comparative companies and for petitioner was used. There was no showing whatever that any of the book values for the various corporate assets, especially petitioner's assets, were at all close to the actual or market value for the same assets. The book value for assets is often at some variance with the actual or market value of assets, and any calculation *292 based thereon in subject to considerable error. Also the five preferred stocks used as comparatives have voting rights and rights on liquidation that vary not only with one another but also with petitioner's stock. Comparison of stocks with differing rights, especially preference rights on liquidation, without making compensation for such variations, which was not done in the present case, would almost necessarily lead to some error. Also, in connection with the testimony of its expert witness, petitioner stresses the fact that its witness assigned no value to the patents held by petitioner which were of substantial value. However, there is no showing that the companies used as comparatives did not have patents which were carried on their books at nominal value. Petitioner also contends that the consideration given by its expert witness to its earnings potential was ultra-conservative since the latest years' earnings were given only the same weight in the computation as the 5-year average which included years before petitioner's patents accounted for much of its increase in income. However, there is no showing in the record of what particular circumstances, if any, might have been *293 present in the case of the five companies used as comparatives. The evaluation by petitioner's expert witness was entirely on a statistical basis. The companies used in the comparison were not in businesses similar to petitioner's. Petitioner's contention that the fact that its employees exchanged $100 in checks for each share of preferred stock received and that the petitioner withheld taxes upon the basis of a $100 valuation for such stock is indicative of a $100 value for the stock is without merit. We have already held that the employees never "bought" the stock at all, but rather endorsed checks with a face amount of $100 for each share of stock received. There was no purchase here but merely the issuance of stock. Therefore, the fact amount of the checks is entirely immaterial to a determination of the value of the stock. Also, the fact that petitioner valued the stock at $100 a share for purposes of payment of withholding tax is of little weight. On the other hand, we do not feel that the average sales price computed on the sale of 402 shares of the preferred stock over a 21-month period should constitute the sole consideration in determining value. These sales show wide *294 fluctuations in price over short periods of time. For example, on July 31, 1956, one lot of 3 shares was sold for $100 per share, whereas, on the very same day, another lot of 22 shares was sold for $65 per share. There is no indication in the records of any normal factors which would cause such a wide fluctuation. The purchaser in each one of the transactions is either petitioner, Kershaw, Kershaw's son, or Royce Kershaw Company, Inc., a corporation controlled by the same interests. In these circumstances, we do not feel that the sales were transactions between "free" buyers and "free" sellers so as to set a fair market value. For many of the same reasons that we do not consider the average sales price of the stock over the 21-month period to be conclusive of fair market value on August 19, 1955, we do not consider the sales price of the 6 shares of stock sold on that date, or the average sales price of the stock sold from August 19, 1955, throughout the remainder of the fiscal year 1956 to be sufficient to establish the fair market value of the stock on August 19, 1955. Unfortunately the record is unclear as to exactly what preferred rights petitioner's preferred stock has. The *295 stock certificate itself tells us that the dividend will be $5 per year, noncumulative, and that the stock is nonvoting. There is no clear evidence in the record indicating what preference, if any, is given to petitioner's preferred stock as to the payment of dividends or as to the distribution of assets upon liquidation. Also, as noted above, there has been no showing that the book value of petitioner's assets is at all related to the actual or market value, and, therefore, we have been reluctant to give much weight to the value of the assets as stated on the balance sheet or to the large amounts of corporate net worth which are derived from such book values. In making our valuation, however, we relied to some extent upon the large amount of earned surplus per each share of preferred stock outstanding as set out in our Findings of Fact. Of more importance to us was the fact that the earnings per share of preferred stock outstanding after the August 19, 1955, distribution, based on net income for the taxable year ended April 30, 1955, after payment of Federal income taxes as reported by petitioner in its return, was $45.97, and based on the net income after Federal income taxes as *296 reported for the taxable year ended April 30, 1956, was $87.81. This would show that at the time of the August 19, 1955, stock distribution petitioner's income far exceeded its $5 per share dividend responsibility, and that the prospects of the shareholders receiving dividends in the future were excellent. Another factor upon which we placed heavy emphasis was the steady improvement in gross sales and net earnings of petitioner from its inception in 1946 until 1957. These facts substantiate Kershaw's testimony that there was a steady and increasing demand in the railroad industry for the type of machinery manufactured by petitioner and that the indications were that the earnings of the company would increase for a number of years in the future. This general aura of growth and optimism as to the future prevailed in petitioner's enterprise on August 19, 1955. Although there was much testimony to the effect that the employees themselves would have preferred $100 in cash rather than a share of $100 par value preferred stock, there was no evidence that at or about August 19, 1955, there was any great dissatisfaction with the stock, or a great rush to sell it. Kershaw testified that many *297 of the employees expressed a preference for a bonus of preferred stock to a pension plan. We did not give much weight to the fact that there had been a 5-year lapse in dividends on the preferred stock prior to 1953 because until 1953 the only holders of the preferred stock also held a major part of the common stock and presumably were able to control their investment through their common stock holders. We have considered the fact that the prospects for future earnings of the company were such that it was reasonable to anticipate as of August 19, 1955, that dividends would be regularly paid in subsequent years. This prospect as to payment of dividends is corroborated by the fact that all dividends have been paid on the preferred stock since 1953 with the exception of one 6-month period in 1957 when the petitioner was experiencing a strike. Considering all the evidence we have determined the fair market value of petitioner's preferred stock on August 19, 1955, to be $70 per share. Decision will be entered under Rule 50.